am pleased to report, my name is Andrew McLachlan, and with my colleague Manning Evans, we are pleased to represent the government appellants and respondent in this case. The government believes that there are three issues before the court here. The first involves whether the district court decision in this case should be summarily reversed in light of the Supreme Court's decision in Morales-Santana. We believe that that's a fairly cut and dried issue on its face. Second, whether the Morales-Santana decision forecloses any opening for Mr. Villegas-Sarabia to claim citizenship from birth, such as he has suggested in his response to the government's motion for summary reversal in this case. And finally, whether, assuming he is an alien, assuming it's found to be that he is an alien, whether misprision of felony is a crime involving moral turpitude that statutorily bars him as an alien from adjusting his status and therefore from being removed. Now, with respect to the first issue, the reason I say I don't think the court needs me to spend a whole lot of time on this case because this case and Mr. Morales-Santana's case involve the exact same statute and the exact same claim of an equal protection violation and the exact same remedy involved. Has anything happened on remand in Morales? No, Your Honor. The Second Circuit hasn't acted in any way on the remand case in Morales. Why do you think there was a remand? Just because the Supreme Court usually remands as a matter of course? I mean, what's left to do in Morales? No, Your Honor. The part of this case was a petition for review case. The Second Circuit granted the petition for review. The Second Circuit now has to deny the petition for review. That's the clear thing that needs to take place in the Morales-Santana case. It's not clear how much the Supreme Court understood about how... Morales-Santana had a number of petitions for reviews, his removal order dates back. But another way to look at it is they remanded because the whole issue of prospective relief was so difficult for the court. It consumed most of the oral argument and the language and the opinion... Your Honor, it consumed a page of oral argument. No, in the oral argument, Needler's argument with the justices, almost all of it to my read was, what's the remedy here? How can we find a constitutional violation and have no remedy? And so the justices explored that at great length. And then in the decision, they don't give much direction, but they do remand. So aren't they... What they chose to do instead was, and what I read into the oral argument, is that they were exploring what the government had suggested in the briefs. And that's quite simple. The first question before the court is what to do about this group of people, including Mr. Morales-Santana and, in this case, Mr. Villegas-Zarrabia, that were born between 1952 and 1987. And that was the central issue being presented in the case. And what they decided was, if Congress had been told that this was an equal protection violation and you can't distinguish out unmarried mothers as you have done, what they would have done is they would have established the general rule for all. So the general rule for all becomes the rule. That's the ruling of the case. Now, there was an exception that existed for 65 years for unmarried mothers that they only had to show one year of continuous presence. And the argument that was presented in our briefs and discussed in the oral argument was that you can't undo that. You can't take that away. So that's what we read into that portion of the Supreme Court's decision. The vast majority of the remedy portion of the Supreme Court's decision deals with that group of people. What do you do and how do you decide between those two available options, the statute at the time that Mr. Morales-Santana was born and Mr. Villegas-Sarabia was born? Is it ten years or is it one year? And those are the only two options. The Second Circuit asked for supplemental briefing on this issue? It has not, Your Honor. So your view is there are just two options. The Supreme Court has cleared those two. They chose to level down. The Supreme Court actually said there are only two options. And therefore, going forward, we have equality. Historically, we have inequality. We're just going to live with it. No, Your Honor, in the introduction and in the remedy portion of the decision. In the introduction, they said, we cannot convert 1409C's exception to our unwed mothers into the mean rule displacing 1401A.7 covering married couples and 1409A covering unmarried fathers. We must therefore leave it to Congress to select, going forward, a physical presence requirement ten years, one year, or some other period. So in that sentence and in the sentence that appears at the end of the decision at 1701 in the Supreme Court order, going forward, Congress may address the issue and settle on a uniform prescription that neither favors nor disadvantages any person based on gender. So that is their transition from talking about the 1952 to 1956 period. Now they're talking about what Congress can do. And they're looking retrospectively and prospectively. Congress can fix both problems. Congress can say, going forward, here's the one standard, and they can choose. What's the State Department doing right now? Are they holding in abeyance people that might benefit? Actually, there are relatively few claims of this sort that cover this period of time. But for... What about the representation of the Supreme Court where actually there are thousands of kids in this situation because it's American business, women and men? Correct. So the current applications, typically this happens at the time of birth. So the current application is what the State Department and DHS also issues, certificates of citizenship. The application for births since June 12, 2007, that's easy. The Supreme Court has said in the interim, here's what you're going to do. It's five years or else you don't get anything. It's five years and two years, that combination standard. So that is being applied. And the one-year rule is no longer being applied for births after that date. Before that date, however, those people became citizens at birth. We can't take it away. And that's what the discussion that you see in the oral argument, that's what the discussion you see in the government's brief indicates. So you have this... The correct remedy is ten years for all for that period of time. And those people are getting exactly what Congress would have intended. Not only that, they had no expectation. They had no reliance on anything other than that. However, the one-year people got citizenship at the time. There is a veneer issue I have. Disabuse me of it if I'm wrong. But this individual, he was born just months too early because then he moves to the U.S. within his first year. Had he been born in the United States, we would have no issue. He'd be a citizen. Roberts. Mr. Vies, sir, I think that's correct. Then his father, by just one year, loses under the old version. He would have been a citizen had that one year not occurred. Right? None of the facts is the district court asserted them, yes. Okay. And he's, understandably then, by these few months' differentials, both by his own birth and his father, he applies to be a U.S. citizen. Correct. But then from his past comes a misprison when he was 20 years old? He had more than one conviction, yes. Well, he gets a misprison of a felony. That's that. But were that not there, he could change his status. Yes. Even if it's there, he could have. But he gets the 922G, aggravated felony. Let me make it clear. He's already, he entered the United States as a lawful permanent resident. Right. So in adjusting his status, he's readjusting his status to make up for the grounds of deportability that intervened. But all these things had to coincide for him to be in the predicament where he is now, where ICE is saying, we're going to remove you. Not every single one of these had to happen. He might be able to change his status based on the misprison alone, correct? Honestly, there's far more than that. He could have become a citizen before this time. Okay. And Morales intended. Let me get to where I'm getting. What are the, where in the record will I find the underlying facts for this misprison? What, was it a heinous felony that he concealed? What was the felony that was concealed? I'm actually drawing a blank right now. It's in the record. I just don't recall at the time. And the 922G at 17, 14, 17 years later, he pleads to possessing a gun and that's a felony because he had a prior felony, which is misprison. No, no, no. The grounds of removability was. I'm asking you what the ground for the 922G conviction was. What was the prior felony that made it so he couldn't have a gun? I think it was the misprison. Actually, an alien is not allowed to have a gun at all. Oh, he, that's the provision under 922? Not, there's two possible. I'm not confident I know the answer to that question. Okay. So we don't know the facts in the misprison, which does relate to whether it's a CIMT, at least at Ninth Circuit, Second Circuit, they might see there was some room. We don't really know the facts of the gun, but it's fair to say this guy, of the gun offense. The key with the mis, do you want to talk about misprision now? Well, I'm actually asking you for record, what were the facts of the 922 offense that is the aggravated felony that means he cannot get a waiver and or what were the facts of the misprison that we've got to conclude legally as vile or morally outrageous? I did not spend a lot of time looking at that given that he conceded his removability on the basis of that and he conceded that he wasn't eligible for a waiver of inadmissibility on the basis of that same conviction. So I mean, this just builds to, again, you've got a human that in his earliest months misses a citizen by jus terci here. Then his father misses just by a little bit. Then he's, as far as I can tell, he's got one felony in misprison. We don't really know what it is. Then over 10 years later, he has a gun, which by virtue of a misprison, he couldn't have. He's then applies to be a citizen. And all of a sudden now he's getting deported. And there's an equal protection violation based on his deportation, but he can't get relief. It's just the saddest saga of just misses is how I'm looking at it. Carlos Santana missed by 21 days. Right. So I would say that his situation is also... Let me just then one, I mean, you do have enough time because we have an extended time. Would there be any reason to think that when he pled to the 922 offense, he was told, oh, by the way, now, even though there's, it will be an equal protection violation, you could be deported. Is it even conceivable his lawyers gave him Badea advice saying, watch out down the road because you are incorrect. You see my point? All I can say is when Mr. Morales Santana went before the immigration judge, he conceded those, that conviction and conceded that it made him removable. And he did not argue anything associated with a defect in the underlying conviction. We're not telling you that it all looks like you are here, but guess what? It may be when you apply to be a citizen, it turns out they're going to turn around, try to remove you. Isn't that when ICE began removal proceedings is when he went in to try to change, to be a citizen? No, that's not my understanding. My understanding was he, it was after his conviction for the 922 offense that he was put in proceedings. But again, that's something that really doesn't get developed in this record, so I didn't look closely. Maybe go to the CIMT, because we're joining a split either way we rule, right? Yes. With respect to the CIMT, I think that's correct. I don't think this Court has a whole lot of options on the CIMT, and let me explain to you why. In this Court, this Court has held and has deferred to the Board, and it's in precedent that it's deferred to the Board on the definition of CIMT, and that that definition includes deceit offenses. So we've established that. That's already the precedent of this Court. Then this Court held in Patel that the elements of this offense, this misprision of felony crime, include deceit. Now, Patel was not a CIMT case, it was an aggravated felony case, but they held that the concealment element of this offense equals deceit. So concealment, deceit, crime involving moral turpitude, that's already in the precedent of this Court, and you are bound by that precedent. Now, that's a simple way of looking at it. I encourage you to go ahead and look at the Robles-Urrea Board decision, because it makes a lot of sense as well, and here's why. The original decision in Sloan on which this generated, the Board originally held in a case where it dropped a single paragraph about multiple offenses involved in the Sloan case, but the Board said, look, it doesn't look like the underlying offense here is a crime involving moral turpitude, so how can misprision be a crime of moral turpitude? And they compared it to an accessory crime, to the accessory crime that immediately preceded it in Sloan's case. Forty years later, after a number of decisions by a number of courts of appeals had said, that doesn't quite work for us, and after the Board had held, we don't look to the underlying offense to determine whether a misprision crime or that sort of crime is a crime involving moral turpitude. We're not allowed to look to the nature of the underlying offense or the gravamen of the underlying offense. What you're limited to, by the categorical approach, and the Board held it way back in Torres and has since held it, a number of times, based on the more recent Supreme Court decisions, the misprision crime has a specific set of elements, and this Court held it to tell that it's not even divisible. It's got to stand on its own. So you look at the offense as it stands on its own, and you have concealment and felony, and that's it. You've got those elements, and the question is, does that categorically become a crime involving moral turpitude? The Sloan analysis of, well, you could have misprision of a crime that wasn't a crime involving moral turpitude become a crime involving moral turpitude on itself, and that doesn't make any sense, that's what's repeated in the Ninth Circuit's decision objecting to robochuria. That analysis is simply wrong. You don't look at the underlying decision anymore. It does seem at least counterintuitive. Maybe it's just adding to Judge Higginson's parade of unlucky facts here, but in my reality that I've seen, misprison is rarely, if ever, charged as an initial crime. Something more serious with a more serious punishment is charged, and then you work out this plea to misprison, which is usually a much lesser sentence. In the federal system, it certainly is a much lesser sentence with a cap. So it does, a lot of times, the underlying offense wouldn't be a crime of moral turpitude, but people are pleading, thinking they're getting a better deal, but at least for immigration consequences, it's actually a much worse deal, but I don't know that that affects the analysis. It does seem counterintuitive, and maybe it goes to the point about being warned about immigration consequences at the plea hearing. Right, and that would have to be developed in a different context, frankly. To a large extent, that has to be developed back in front of the trial court if you're going to be arguing that Is that still available here? No, Your Honor, not that I know of. So what we have here is a situation where this court's precedent tells you that the CIMT ruling in this case is correct. It is a CIMT. This court has said so. Is that one CIMT? You lie to a federal officer. No. It isn't? No. But that would have deception in it. It has deception in it, but the board went a little bit further and said it's not just any old deception. It's not a white lie. It's the misprision of a felony. It's the affirmative act of concealing a felony that makes this a difference, and you kind of see that in the Eleventh Circuit's analysis in Itani, which the board adopted. You see that in this court's analysis in Smalley. That's a hard line for me to fully understand, so it's not deception that turns something into a CIMT, because if it were, 1001 would apply. So it's something more than deception, and a misprision always has the something more? All I can say is the board said it's got deceit about a felony. They said that, and they didn't say it just has deceit. The Itani court talked about, used a different word, dishonesty about a serious crime. In the Smalley case, this court was referring, specifically referred to the underlying crime, the drug crime. So all I can say is that the standard appears on its face to include more. The Supreme Court, however, didn't have that pause. The Supreme Court simply said in Jordan v. DeGeorge that deceit or fraud involves moral turpitude. Roberts. So what's the government's position? Put aside BIA and deference. Would you say 1001 would have to be under this logic? Carvin. I believe that 1001, I think the board has said that 1001 does not involve moral turpitude. Roberts. I know. I'm not asking the board. I'm asking your view, having just told me that the deception. Carvin. The board can, within the context of the immigration statute, which Jordan v. DeGeorge did not involve, the board can say, can refine what moral turpitude means within the immigration statute. Roberts. But the board originally said misprision wasn't. Carvin. That's right. Based on a reason that the board has now decided to say. Roberts. And at first, because of a circuit opinion, as far as I can tell, and now you're saying we have to defer to that. Carvin. Yes. In this case, the board specifically acknowledged the Ninth Circuit's decision in Robles-Urrea and said, this isn't the Ninth Circuit. This case takes place in the Fifth Circuit. Here we have the board's law in Robles-Urrea, and we have the Fifth Circuit's law specifically citing Smalley in the board's decision. The immigration judge specifically cited Patel as well. So they were clearly rolling those things together. The board is the, you may know this, has the government been encouraging the Supreme Court to get in and resolve this? Or is the government opposing certiorari on these cases? Roberts. The government opposes certiorari in almost every kind of case. Carvin. But this issue would seem to be very unfortunate. It wasn't that Judge Calabresi's remand in the Second Circuit precisely because as to immigration, we need uniformity. Why wouldn't the government, do you have any thoughts? Roberts. The reason we would, I can't speak for the Solicitor General of the United States, but I can tell you that the kind of rationale that we put forward when we're analyzing these issues involves, this is something the board can fix. This is something you don't need the Court of Appeals to fix. This is something that the Board of Immigration Appeals can fix. Carvin. But the board hasn't ruled in the Second Circuit case. Roberts. The board has not yet issued a precedent decision on, there was actually an oral argument on a CIMT case just this year, I think, in which theoretically the board could issue a precedent decision. Again, I can't promise what the board is going to do in these situations. But that's part of our rationale. Just the mere fact that the circuits are divided, the mere fact that one circuit has asserted that they really could use a decision that tells us what the board thinks. And that's what Judge Calabresi was asking. He said, look, the Ninth Circuit has since disagreed with you. You haven't responded. What's your response? Here's the response. Now, it's a non-precedential decision, but they specifically say, our precedent is Robles-Urrea, the board decision. And the Ninth Circuit's decision applies in its circuit, and we're going to apply it in their circuit because it's that law. But in every other circuit, the circuits that haven't ruled, we're going to continue to apply Robles-Urrea as our law. So you have at least skid more deference to this unpublished board decision in this very case. All right. Thank you. May it please the Court. My name is Lance Curtright, and I represent Leonardo Villegas Ferrabbia and his father, Leonardo Villegas, Jr. On the citizenship issue, the guiding principle for the Court to follow in crafting the remedy is found in the Morales-Santana statement that government must ensure that the laws in question are administered in a manner free from gender-based discrimination. These very laws that are in front of the Court today. The remedy that Villegas-Ferrabbia puts forth attempts to do that. The remedy the government places in front of the Court doesn't provide Villegas-Ferrabbia and Morales-Santana equality whatsoever. Their remedy— That was squarely before the Supreme Court. Yes, it was. And they decided that they didn't need to level up. That's right. They found they could not do that because they didn't think Congress's legislative intent in 1952 did that. Why isn't he identically situated to that gentleman? It seems unfortunate, but— Well, I think he is, and I think Morales-Santana and Villegas-Ferrabbia are both going to enjoy the possibility to show the five-and-two-year rule. On remand, I think prospectively going forward, what they meant to say was all applications that the government decides in the future will apply a five-and-two-year rule. That means that Villegas-Ferrabbia's father— They possibly thought that would apply to someone who was under the 10-year fix. I mean, the way I read it, they excise out the one year that was given this—the way they end up looking at it, this exception, this windfall to children of unwed mothers. What basis is there then for saying someone in your client's position should get a benefit of a statute that Congress never applied to him? I think there's a couple of answers to that, Judge. The first is in Morales-Santana's plain language, that penultimate sentence when Justice Ginsburg writes, 1401A7, now five-year requirement going forward, should apply with a five-year rule. To children born to unwed U.S. citizen mothers. I read that to say children born going forward are in the five-year—you need to know you're not getting the one year anymore, the one year's off the books. Why isn't that, given that it talks about children born— I think you have to look at what she cites. She cites a superseded statute. 1401A7 was superseded in 1986. It's been renumbered as well. It's now at 1401G. The only way that a superseded statute has a prospective application is if the substantive requirements of that statute somehow change. 1401A7, the superseded statute, can have no prospective application going forward to children who are no longer born because it's no longer the books. It's 1401G. Explain to me what rational purpose would there be for applying the five-year statute to someone who clearly was under the 10-year statute according to the law at the time. How does that remedy the discrimination? Because the discrimination was never between the 10 and the five-year rule. It was between the 10 and the one-year rule and then later the five and the one-year rule. So what does that have—that still doesn't remedy the discrimination because someone born at the same time as your client to an unwed mother would have become a citizen under the one-year provision? Well, it remedies the discrimination in a way that is better than the government's remedy. Under their remedy, there is no equality at all for children born to unwed fathers from 1952 to 1986. My remedy at least provides a modicum of equality. Now, it's not perfect equality. Well, it's better for your client. I understand that. Well, sure. But how is it equality because it's still not getting them to the one-year? Well, there's no equality being given under any remedy that's being put forth through the court. But remember—I guess that's the problem. Well, but the court said going forward there has to be an application of the law which is free from gender discrimination. And there's no perfect equality here because that would only happen if they leveled down to the one-year. But the court didn't—I think they were not happy with that result. You're just creating more inequality, maybe not based on gender, but all these people who didn't qualify for decades under the 10-year rule that applied to them and have been shipped off. Now someone in your client's situation is getting, oh, well, the benefit of this five-year rule just by the chance that he is now in these proceedings after Morales was decided. I don't think that's more equality. I think everyone who's in that boat would have the opportunity to apply to receive that same benefit that my client has if they're similarly situated. But listen, Morales-Santana was addressing decades of gender discrimination. You can't divorce the remedy from the merits decision. In the merits of this case, they found that Congress had willfully constructed for years gender discrimination and how they muted out citizenship. And the district— But we divorce the remedy all the time, right? The exclusionary rule, qualified immunity. We frequently say constitutional error, but no remedy. Well, in this case, I don't think you should divorce the remedy because I think you have gender discrimination. And in addition to that, you have racial discrimination, as the district court found. They didn't talk about that in the Supreme Court too much, but if you look at what Judge Ezra found in the lower level, the physical presence requirements were designed to make sure that U.S. citizens would not go abroad and marry someone who we did not find racially desirable and bring them back as citizens. So you have gender discrimination coupled with racial discrimination. You are right. This is a question I was wondering both in this case and the Supreme Court case. Would the Supreme Court even have authority to allow—to order your client to be a citizen? Well, they wouldn't order him to be a citizen. They would—I think the way that that works is they restructure the statutes which allow him to be a citizen. And I think that answers the question of the rule at the time of birth that is, I think, permeating this discussion. If you say that the five- and two-year rule applies to my client, it is still under the 1401A7 statute. So that is the law at the time of birth, but you would change the substantive requirements for that in order to comply with the Morales-Antonis finding that the statutes violate equal protection. The mandate for an equal protection violation is equality. My client received none. Why should people who are born to unwed fathers from 1952 through 1986 be the only people who receive no equality? The government has conceded it's a very small group of people. So why not allow him to have five and two years? I suppose you—I mean, the worst-case scenario would be we force equality and therefore you claw back the citizenship of all the children of the unwed mothers. Well, I think the Supreme Court did not allow that, and that's when the government says—has the government—when she writes, as the government suggests in that part of the opinion, she pin-cites the government's brief, and that's what the propositional law they're saying. So you would not go back and take away citizenship already vested. I think Morales-Antonis says you can't do that, and I think that also would raise some serious constitutional problems as well. The five-year rule is a reasonable place for the Supreme Court and this Court to land upon, because that's what Congress did in 1986. You know, Justice Ginsburg, when she says the now five-year rule did not make it up—it wasn't the three-year rule or the seven-year rule—it was the five-year rule. You agree there's been no request for supplemental briefing on the remedy issue in the Second Circuit? That's correct. I'm not aware of anything going on in the Second Circuit. But going back to this crafting the remedy, Morales-Antonis said we should measure the commitment to the main rule. The main rule at issue in that case was the ten-year rule. And then when you look at it now, it's the five-year rule. So the measuring point of where we stand as far as that remedy is, is five and two, not ten and five. So it's not unreasonable for this Court to say that going forward, Virigus Rabia and all applicants similarly situated should apply—have the five- and two-year rule applied to them. But if you apply the five- and two-year rule to Virigus Rabia, then I think the remand under Morales-Antonis makes more sense. On remand, Morales-Antonis, like we hope Virigus Rabia, will have the opportunity to show that his father was here for five years, including two years after 14. And I think that would make more sense just strategically, just structurally with the Court's doesn't believe that my client should receive the benefit of the five- and two-year rule, it still has to grapple with the Supreme Court's guiding principle that the laws must be applied in a manner which is free from gender discrimination. Deporting my client is not an applicational law free from gender discrimination. So if you cannot give him citizenship, I'd ask the Court to remand the case to the Board with instructions to vacate his can act as they're under orders to do to create—to correct the equal protection violation that they created. I think that would at least apply the status quo to this case without causing more injury to my client, who, as you correctly pointed out, Judge, has suffered quite a bit through just bad luck. I sense from the government that there may actually be an interim period where they aren't trying to remove people. They're waiting for Congress to maybe address this issue. Did you hear that stated? Well, my impression is that there's—there will be very little stays being provided now that the Variety Guidelines have changed with the new administration, but I haven't heard from them about this specific case at all about that. I mean, I mean, we've talked about a little bit. I haven't heard from their clients about ICE, how they would handle it. My guess is it would be a case-by-case analysis where I'd have to go and I would suggest the court just terminate outright so he can withhold his lawful permanent residency so he could travel, he could have all the rights that lawful permanent residents at least have. There's support. I guess I was jumping to this situation he's in. In my description of that chronology of unlucky facts, was the chronology accurately described? So let me—I don't know all the—there's a couple thoughts I had when you were doing that. The misprison of a felony crime, I believe there was an underlying element of drugs. It was. I want to get to that in a minute, but it doesn't matter because under the minimum conduct analysis this court applies, we don't look to the underlying facts. So, but just one last point on the— What about the gun? Was it a 920—was it based on his alienage? No, it was a felon. It was a felon in possession. It was based on the misprison. On the misprison. Exactly right. Have you explored the Padilla world on— Well, no, we haven't. We were hoping that he'd be found to be a citizen, but we'll have to go back and do that at this point and see if there was any advisals. We don't have the records from that proceeding or anything. Outside of my practice area a little bit, but I suppose it would be a writ of quorum novus. I don't—I'm not 100% sure, but we can look into that. One more point on that issue of not deporting Villegas Sarabia. There's support for that in the Morales-Santana decision. If you look at footnote 24, that's when the court is talking about convictions that were procured under a statute which found to be unconstitutional. Those convictions are invalid because of the unconstitutional statute. I think there's a similarity that this court can make between deportation under unconstitutional statutes and convictions. Deportation in many cases is a more severe penalty than a criminal sentence, and I think if your court does not want to do the five and two-year rule, although I think that's the remedy most in line with what Justice Ginsburg wrote, I think at least we should move on and give them—and terminate his deportation proceeding. Moving on, Your Honors, to whether misprison of a felony is a crime involving moral turpitude. It's very important that the court keep in mind the minimum conduct analysis that this court applies because a lot of the cases that have addressed this issue, including the cases relied upon by the government, do not apply a minimum conduct analysis. And under this approach, an offense is a crime involving moral turpitude if the minimum reading of the statute of conviction necessarily reaches only offenses involving moral turpitude. I'm not aware of any court that's done that with this statute. But under this minimum reading of the statute, I don't think you're going to find a vicious or corrupt state of mind requirement. You're not going to find that it has to have the element of fraud to commit a misprison of a felony, and you're not going to see that the deceit that Patel talks about is in relation to any government official. You have to act deceitfully, yes, but it doesn't need to be in the obstruction of justice, and that is positive in our favor, I think. What says it has to be deception directed at a government official or law enforcement? No, my point is it doesn't. It does not have to be deception. Well, for misprison, but then I take it your position is that takes it outside of crime involving moral turpitude. So I'm saying what case says that to qualify as a CIMT, the deception has to be directed at a government official? Well, it's kind of a jumble, all these cases that talk about deception. First of all, a lot of them are throwing in together fraud and deceit. And this Court's decision of Patel makes clear they are not the same thing. But then you look at the cases that just have deceit as the... What's the difference as fraud is trying to take property from someone? Well, yeah, so fraud and Patel says it's a material misrepresentation that causes someone to ask to act to their detriment. Deceit, on the other hand, is giving someone a false impression. So there's no, with deceit, I can give you a false impression, but as long as you don't act to your detriment upon it, that would be deceit. Fraud actually has this idea that you've actually harmed someone. Concealment of an offense, of a felony, though, that does sound pretty condemnable. Concealment of a felony by giving deceit, but yes, however, it can be done. There's two things to that. It doesn't need a vicious or corrupt state of mind. You can conceal a felony for benign purposes. Secondly, the concealment doesn't need to be given to any government official. It can be given to a prison family because you didn't want people to know that your brother was a felon. And that's a misprision of a felony under the minimum conduct approach. One of the best examples I think we have is in our brief, where we talk about a person who was deported and came back again illegally. It's a felony under 18 U.S.C. 1326. Suppose it's my brother, and I know that he is here in the United States. I have knowledge of the felony, but I don't want him to get in trouble, so I don't tell the feds or the federal authorities. But then, because I didn't take an act of concealment by saying, hey, I'm going to say that I live in his house, so he can have utilities on, so he can sign, get the gas turned on, and all these sort of things. I had acted deceitfully because I don't really live there, but I did it because I love my brother, and I didn't want to have the family be embarrassed because he's a felon. And I did it, but however, I didn't deceitfully... Why does motive matter? I mean, people commit frauds for benign motives. I'm not sure where you want to get motive into this. Well, I think motive is very important because the motive, or the whole analysis of a CIMT, the question is, did you act with a vicious or corrupt state of mind? And here, my point is, is that you could commit this crime with no bad motive whatsoever, which is why it's not a crime involving moral turpitude. You look at that act of concealment prong, which is, I think, the most important prong for the court to consider. There's no vicious or corrupt state of mind, there's no fraudulent conduct, and there's no deceit to a government official whatsoever. So it's a lot... In a word like turpitude, do we defer to BIA, or... Well, you have a two-part... ...de novo analysis of ours as to whether specific felonies... Right, so it's a two-part analysis. As far as what the crime involving moral turpitude is defined, what that definition is, you defer to that definition, which is the base, vile, vicious, corrupt state of mind, or the fraudulent behavior. But on whether a certain statute meets that definition of moral turpitude, that's de novo, because the board has no expertise in what federal statutes, in how they operate. So that's how that works out. I think the best case for that is the Mercado case, which we cite in our brief, Judge. Opposing counsel just began by saying, we don't even have flexibility here. Put Fuentes with Patel, and then six of our colleagues in two unpublished decisions. You've got a lot of Fifth Circuit direction that misprison is vile. Right. So you have a lot of flexibility, because none of these courts, none of those prior decisions applied any minimum conduct analysis, and there's no precedential authority on this issue whatsoever. A lot of this comes from the Ashcroft case, is what the court, I think most of the cases that you looked, that stems from, is from Smalley. Smalley did not address whether this statute was a crime involving moral turpitude. Rather, it was looking to see whether money laundering, laundering of drug monies, was a crime involving moral turpitude. And it relied on the Eleventh Circuit decision in Itani to find that it was a crime involving moral turpitude, the money laundering. Is Itani a money laundering? Itani was misprisoned, right? Itani was misprisoned from the Eleventh Circuit. The Eleventh Circuit cites Fifth Circuit authority for that rule. I don't remember that one. You might have me there. If it did, it would be hard, a little problematic. Well, but it's not, no, because there's no minimum conduct analysis. There's none. I mean, they're just saying, hey, look, first of all, Itani groups together deceptive and fraudulent conduct, and as I, I think Sean... When you say minimum conduct, and I do get confused in this world, but what you're saying is do what, what, what the Ninth Circuit is doing, remand for a modified categorical peak? No. No. So is that, is the Ninth Circuit wrong too? There's really a third option here? Well, the Ninth Circuit's right on their merits, but their, their standard is wrong. The minimum conduct that this court applies says, you look at the least culpable conduct... That's from the Supreme Court. That's from the Supreme Court. So, so it's not even just a split. What court would you say got it right and we should follow? Well, Ninth Circuit. But you just said they got the standard. They have the standard wrong, but they have a more broad standard. Their standard is even more... So what court had, had is it right in entirety? Anyone yet? Well, you're going to. None yet, Judge. So what about Judge Calabresi's approach? The Second Circuit. Yeah, that's not a bad approach. If the court remanded it to ask the board to give some type of clarification, that's not an unreasonable thing for the court. But the board can't make this uniform, right? They can't. Now we've, now that you've the Ninth Circuit up there, the board can't do anything to change that. I think that's right because you're always going to have to do a de novo analysis. Even if they came back and they remanded it and they said, yes, it's a misprint, it is a CIMT or no, we'd come back and say, you have de novo review over that because you can only defer to the board and how they define crime involving more interpretive. But one of you two is going to take our case to the Supreme Court. Hopefully them. But yeah, so there's a, there, this issue of deceit, however, I think is the, it's the main, it's the main problem. And I think there are some cases that we cite in our briefs that show that deceitful conduct is not always per se a crime involving moral turpitude. Maybe the best example, though, is this false statement to a federal officer under 1001, which the government concedes is not a crime involving moral turpitude, if I heard them correctly. I heard that. I hadn't researched it. I was just wondering. There's a case called U.S. v. Hirsch from the Ninth Circuit that finds that as well. There's some, it's somewhat arguable. But supposing that's true, just compare that. You have someone telling a federal officer a false statement. But in this prison of a felony, you don't have to tell a federal officer anything and still be found. But the 1001 might not be concealing a felony. The overall underlying conduct might be entirely innocent. I mean, that's the criticism of 1001 prosecutions. Still, it's not material, but. Well, right. But again, the key interest, what's the issue with the crime involving moral turpitude, right? So if you're saying a lie to a federal officer, I mean, that's typically, in most areas, that'd be a crime involving moral turpitude. But in this prison, that concealment doesn't need to be to any law enforcement official. I think the board even said that in matter of Espinoza. So when they said it wasn't an obstruction of justice, an aggravated felony. So in this prison of a felony, there's no vicious or evil, corrupt state of mind. There's no fraud involved in it. And the deceitful conduct that is being alleged does not need to be in the service of obstruction of justice. Well, you don't have any of those, or you don't necessarily need to have those. You do not have a crime involving moral turpitude. This is the hypothetical world, which is, again, counterfactual if you're telling me the misprison was to hide a felony drug offense. But that's where we are. Yeah, that's right. But the actual facts of what happened are neither here nor there. But your brief is offering a lot of hypotheticals. Well, we're trying to show you in the briefs that there are situations where there's minimum conduct that exists. I hope that... Yeah, no, I understand. Yeah. So the Smalley case was talking also about illegally gotten drug money that was laundered. And that was a big point of emphasis in that case. But I don't think Smalley did the minimum conduct analysis either, which I think is important. The Robles-Urrea case from the Ninth Circuit specifically rejected the board's analysis because the board said that there was a vicious or corrupt state of mind involved in this prison, but the Ninth Circuit said there's no such vicious or corrupt state of mind. And I think under a minimum conduct analysis, it's hard to find one. So, Judge, I think that's my argument. I'll take my rest for rebuttal. Do you get... Wait, I'm presiding for the recess. Yeah, so he has 10 minutes. Oh, yes, you do. You do. You're right. Thank you. Your Honor, we do appreciate you granting us this unique arrangement because of the peculiar nature of the case. I worked very well with Mr. Kriprite, and I appreciate the Court working well with us to reach that end. Do you think it's still best to keep these two consolidated? I believe it is best, Your Honor, given that the citizenship issue permeates both. You have to go beyond the citizenship issue in the Petition for Review case. You don't have to go beyond the citizenship issue. Do you know, just as an officer of the Court, whether the government is receiving from these very small category of people, whether you're receiving requests for abeyance? Do you happen to know whether that's happening? The Immigration and Customs Enforcement has told me that they have not received any requests for deferred action or something along those lines at this point, that they're not aware of any at this point. With respect to applications for citizenship and things like that, there have been a couple of requests that have come in, either to State Department or DHS, for some document associated with this case. Most of those have fallen within the five-year, actually all of those have fallen within the five-year category, and those have been granted. Let me make two points, very quick points, on the crime involving moral turpitude point to clarify something that just came up. First of all, it was repeated several times that there's no requirement to conceal from a government officer. I must be reading a different statute. This statute says, conceals and does not make known as soon as possible to some judge or other person in civil or military authority. It's not just anybody. It's those people, judges, civil or military authority. So that's the first point. The second point is, as this Court pointed out, that was the decision in Naitani, who was based on Fifth Circuit law, and the decision in Patel, obviously, was based on Fifth Circuit law. For example, in the Patel case, Montgomery is cited, and Montgomery refers to the you're right, I've always thought that conceal, without making known to a judge, was itself sort of odd, one. But I don't think our pattern instructions do tie the act of concealment to a law enforcement authority. But the statute reads the way it does. And that's what this Court said in Patel. Oh, from law enforcement. I hadn't thought about it until I read Patel, but as soon as I read Patel, I said, well, that's what it says. So that point needs to be made. The other point, this use of the minimum conduct phrase is a canard. The Court, this Court, repeatedly, in several different instances, has referred to the necessary conduct for a crime. That's exactly the same thing we're talking about. The minimum conduct, the necessary conduct, it's all the same. So that's not worth even thinking about. Now, I need to talk a little bit about this interim rule and how that comes about and how you know that it really, truly is prospective, referring to births that take place after the Supreme Court's decision. First of all, there wasn't any relief for Morales-Santana. And the Supreme Court says at the very opening of this decision that Morales-Santana had been continuously in Puerto Rico for more than 18 years and more than four years after his 14th birthday. So if the rule was going to be 5-2, Morales-Santana was eligible under that rule at that time. Now, it gets back to that remand question. What circumstance would the Supreme Court not remand a petition for review? The only circumstance where the Court would not remand a petition for review for the Second Circuit to reverse its ruling was if it was affirming the Second Circuit. So the Supreme Court could, based on those facts, if it was saying 5-2 applies to everybody retrospectively, the Supreme Court could have said, we affirm the decision of the Court of Appeals, albeit for different reasons, but we affirm their judgment. They could have said that and they didn't. So you know both of those points from that. It can't be anything other than prospective because they didn't apply it to Morales-Santana. Now, Mr. Vigna-Sarabi stood here, Mr. Curtright stood here and asked you to do exactly what the Supreme Court said it would not do. In several ways. First, he asked you to rewrite the statute. The Supreme Court said, we are not equipped to do that. This Court, in Cervantes-Nava, used those exact words. We don't rewrite statutes. So rewriting the statute is something foreclosed by not just Morales-Santana but this Court's law. But second, the Supreme Court said, in choosing a remedy, we have to avoid disrupting the statutory framework. That's exactly what Mr. Vigna-Sarabi is asking you to do. He's asking you to pull unmarried fathers out of one section of the statute and put them into a different, or apply a different section of the statute to unmarried fathers. Now, right after that in the Supreme Court's decision in Morales-Santana, it gave you an example of why that doesn't work. And the reason it doesn't work is that leaves married parents discriminated against. The children of married parents would be disfavored by that scheme. And the Supreme Court said Congress could never have intended that. And therefore, that's one of the significant reasons that they chose the 10-year remedy as opposed to the one-year remedy at the time. Very clear, don't mess with the statutory framework. And specifically, don't divide up unmarried fathers from married parents. You can't do it. The Supreme Court couldn't do it. The Court was nearly unanimous. Was there a concurrence in the dissent? And if so, did they focus on the remedy issue or not? Yes. The dissenting portion of it by Justice Alito and Justice Thomas focused on the remedy portion along the same lines that was kind of referenced in Sir Hans's Nava by this Court. That is, if you can't provide a remedy, do we even get to the equal protection issue? And that's what the dissent focused on in that case. But the other thing you could tell from the dissent is there's no relief for Mr. None can't happen. Otherwise, there might be a case here. So you can tell from the dissent that the majority knew that there was no relief available for Mr. Morales-Santana despite the fact that he would meet a 5-2 rule. Now, let me talk a little bit about reliance here because this is where it becomes understandable. The people who, in 1952 to 1986, there was a statute governing married parents and unmarried fathers 10 years, and that's what they expected. Morales fits in pretty well, at least from my standpoint. So just in the last few minutes, one would think maybe the Supreme Court's remanding because even if you can't become a citizen, there are going to be ways to change your status. It's very awkward, no relief. And this gentleman, he can't because the misprison on top of the 922G, right? That's correct. That's his situation. And that's actually before this court. It wasn't before the Supreme Court. The Supreme Court didn't really understand. That would be his out. But then he's forfeited it by virtue of both those missteps in his life. Yes. I mean, the progression led to that. But literally, it's the only thing he's arguing about is the crime involving moral turpitude, allowing him to readjust his status to the lawful permanent resident status that he was already in. But then he's still got to win on the aggravated felony. No. If he, right? No, if he adjusts his status. But he can't do that if he's an aggravated felon, right? No. No? Okay. The firearms offense is the grounds of immovability. He sought to adjust his status to wipe out the grounds of immovability. Yes. The bar against adjusting his status was the crime involving moral turpitude that made him inadmissible. He sought a waiver of inadmissibility. But the bar against the waiver of inadmissibility was the aggravated felony drug crime. No. If he wins on adjustment of status, you never get to the waiver issue, and it wipes out the grounds of immovability. So he becomes, again, becomes an LPR. So that's the process that this case flowed. You're right, it's very complicated. But it all ends up with a straight split in the circuits. It all comes down to this crime of moral turpitude question for him. Yes. Yes. The reasoning of the Ninth Circuit is what you have to consider if you're going to the question of whether to defer to the board on Robles-Leray. If you reach that, if you can't, if you don't feel obliged to stand by this court's precedents in regarding deference to the board on the deceit crime and the findings of this court in Patel. If there are no other questions, I'll stand on the briefs. Thank you very much. You're up again. How much time do you have? Five minutes is all. Okay. Your Honors, first on that misprision of a felony, Patel lays out the elements. It's one, knowledge that a felony occurred. Two, failure to notify the authorities of the felony. And three, an affirmative step to conceal the felony. That third prong has no element that the affirmative step to conceal was done to a federal authority. That's the second prong. So, would you act deceitfully in that third prong, as long as it's not to a federal official, it's not a crime involving moral turpitude. On the citizenship issue, the government today has provided no answer to the Supreme Court's administered in a manner free from gender discrimination. Their proposed remedy is for you to just leave it there. And I think that that's not what you should do. Rather, I think that you should provide some mode of equality, because that's what the Supreme Court said that you should do. I don't think you should rely on them to do it on a case-by-case basis, because the priority guidelines today, they're going to go full speed ahead on these deportation cases, and my client will not only receive inequality in how the law is applied to him, he will receive a deportation order, which is exactly, I think, contrary to what the Supreme Court meant when it said that the government is supposed to apply the law. Is Padilla retroactive? I didn't check. I assume it is. It's not, actually. I think the Supreme Court said in a subsequent decision, the name of which escapes me, that it is not retroactive after its decision date. So I think that there's a lot of... That would be great if we could go back and undo that conviction. As a pragmatic matter, practicing immigration law, I think that's very unlikely to happen after 20 years and the fact that Padilla is not retroactive. So we could look into that. On this issue of married persons, Your Honors, the government makes much of that. I think the easiest way for the court to consider that is to say, well, it's not before you, and it's a case for another day. However, if it does come up beyond that, then there's no real reason to have discrimination between married and unmarried people either. We're talking about cases that discriminate based on gender, on race, and on marital status. So when the court looks at this arena of the law, I'm aware of no other area that has so much discrimination that is still in place. So it really is not too much to ask, given the history, the historical context of what has happened, to say, give us a modicum, a small amount of equality, so that we can have some relief going forward.